# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

In re:

Lightning Technologies, Inc.,

Case No. 21-41019
Chapter 7
Honorable Thomas J. Tucker

      Debtor.
_____/

Karen E. Evangelista, Chapter 7 Trustee,     Adv. Proc. No. 23-_____

      Plaintiff,

v.

BB Invescor I, LLC,

      Defendant.
_____/

## <u>COMPLAINT</u>

Karen E. Evangelista ("Plaintiff" or "Trustee"), in her capacity as Chapter 7 Trustee for the Bankruptcy Estate of Lightning Technologies, Inc., through her counsel, the Taunt Law Firm, and for her Complaint against Defendant BB Invescor I, LLC ("Defendant" or "BBI"), states as follows:

## Jurisdiction, Venue, and Parties

1.     The United States District Court for the Eastern District of Michigan has jurisdiction of this case pursuant to 28 U.S.C. §1334 and is the proper venue for this case pursuant to 28 U.S.C. §1409.

2.     Pursuant to L.R. 83.50 (E.D. MI), the U.S. District Court for the Eastern District of Michigan has referred this case to this Bankruptcy Court for adjudication.

3.     This is a core proceeding pursuant to 28 U.S.C. §157(b)(2)(B), (F), (K), and/or (O) for which the Court has authority to enter a final judgment.

4.     As required by Fed. R. Bankr. P. 7008, Plaintiff consents to the entry of final orders and judgments in this case by this Bankruptcy Court.

5.     Plaintiff is the duly appointed and acting Chapter 7 Trustee for the bankruptcy estate of Debtor Lightning Technologies, Inc. (the "Debtor") and files this Complaint in that capacity.

6.     Plaintiff is authorized to commence this action pursuant to 11 U.S.C. §323 as the representative of the bankruptcy estate of the Debtor.

7.     Upon information and belief, Defendant BB Invescor I, LLC is a limited liability company whose address is 445 Park Ave., 16th Floor, New York, NY 10022.

## General Allegations

8.      Creditors of the Debtor filed an involuntary petition for relief against the Debtor under Chapter 7 of the U.S. Bankruptcy Code on February 5, 2021 (the "Petition Date").

9.      An Order for Relief was entered by this Court on February 8, 2021.

10.     Defendant BBI filed Proof of Claim No. 52 ("BBI Proof of Claim") against the Debtor's estate, asserting a secured claim in the amount of $2,273,887.37.  A copy of the BBI Proof of Claim is attached as **Exhibit 1.**

11.     The BBI Proof of Claim states that BBI's claim is "approved and authorized pursuant to that certain Subordination Agreement dated November 19, 2020 executed by BBI, the Debtor and Grow Michigan, LLC, and that certain Board of Directors Resolution adopted by the Board of Directors of Debtor on August 24, 2020…"  BBI Proof of Claim, **Exhibit 1**.

12.     The BBI Proof of Claim asserts that BBI holds a secured claim against all of Debtor's assets ("Debtor's Assets") by virtue of filing of a UCC-1 financing statement with the State of Delaware. BBI Proof of Claim, **Exhibit 1.**

13.     BBI filed a UCC-1 Financing Statement against the Debtor in the State of Delaware on or about January 29, 2021 ("Delaware UCC-1").  BBI Proof of Claim, **Exhibit 1.**

14.    BBI also filed a UCC-1 Financing Statement against the Debtor in the State of Michigan on or about October 31, 2020 ("Michigan UCC-1"). BBI Proof of Claim, **Exhibit 1.**

15.    At all times relevant to this Complaint, the Debtor was a Delaware corporation.

16.    The Board of Directors Resolution dated August 24, 2020 ("Board Resolution") referenced by BBI in the BBI Proof of Claim as establishing a loan obligation between the Debtor and BBI is attached as **Exhibit 2.**

17.    The Board Resolution reflects a balance due to BBI in the amount of $1,012,803.59 as of August 24, 2020.

18.    In response to the Trustee's Subpoena to BBI (Docket No. 292), BBI produced a ledger in support of the BBI Proof of Claim alleging a balance due of $2,273,887.37 ("BBI Ledger").  A copy of the BBI Ledger is attached as **Exhibit 3.**

### *BBI's Option Agreement*

19.    In May 2020, BBI and Grow Michigan, LLC executed an Option Agreement ("Option Agreement") which created a contractual option for BBI to purchase Grow Michigan's secured lender position against the Debtor in exchange for payment by BBI to Grow Michigan.  A copy of the Option Agreement is attached as **Exhibit 4.**

4

20.     On or about May 28, 2020, BBI paid $965,589.05 to Grow Michigan as a partial payment towards the Option Agreement.

21.     On or about November 19, 2020, BBI and Grow Michigan executed a letter agreement ("Letter Agreement", attached as **Exhibit 5**) which, among other agreements, (a) extended the deadline by which BBI was required to satisfy the terms of the Option Agreement; and (b) required BBI to make twenty-five (25) consecutive payments in the amount of $100,000 each to Grow Michigan.

22.     BBI made four (4) payments in the amount of $100,000 each to Grow Michigan in the fall of 2020 pursuant to the Letter Agreement ("Letter Agreement Payments").

23.     BBI recorded the Letter Agreement Payments as a loan to the Debtor and has included a claim for recovery of the Letter Agreement Payments from the estate in the BBI Proof of Claim.

24.     BBI also seeks to recover fees pay to Howard & Howard, counsel for Grow Michigan, through the Proof of Claim in the amount of $383,137.89 ("H&H Payments").

25.     The BBI Option Agreement specifically provides that payments by BBI to Grow Michigan under the Option Agreement shall not be applied to the obligations of the Debtor to Grow Michigan.  Option Agreement, **Exhibit 4,** paragraph 1(b)(iii).

5

26.     The Option Agreement specifically provides that the "Option Payment shall be payments in consideration of the granting of the Option and applied to the Purchase Price at Closing".  Option Agreement, **Exhibit 4,** paragraph 1(b)(iii).

27.     The H&H Payments were payments required by BBI under the Option Agreement and were not applied to reduce the Debtor's loan balance with Grow Michigan.

28.     The Letter Agreement Payments were payments required by BBI under the Option Agreement as modified by the Letter Agreement and were not applied to the Debtor's loan balance with Grow Michigan.

29.     The BBI Ledger provided in support of the BBI Proof of Claim reflects that BBI seeks to recover payments to Foley & Larder in the amount of $30,624.50 in May and June 2020 for "SEC and FINRA Advice" (the "Foley 2020 Payments"). **Exhibit 3.**

30.     The BBI Ledger provided in support of the BBI Proof of Claim reflects that BBI seeks to recover payment to Foley & Larder in the amount of $61,817.50 on April 28, 2021 for GM Note Review ("Foley 2021 Payment").  **Exhibit 3.**

31.     Upon information and belief, Foley & Larder was representing BBI in negotiation of the Option Agreement with Grow Michigan during May and June 2020.

32.     The Foley 2020 Payments were made for the benefit of BBI and did not benefit the Debtor.

33.     The Foley 2020 Payments were made prior to the Board Resolution, but were not included in the Board Resolution as approved loans to the Debtor.

34.     The Foley 2021 Payment was made after the Petition Date and is not recoverable by BBI as a claim against the estate pursuant to §502(b).

35.     The Foley 2021 Payments was made for the benefit of BBI and did not benefit the Debtor.

36.     The BBI Ledger provided to the Trustee in support of the BBI Proof of Claim, includes a payment on May 4, 2020 for $100,000 entitled "Loan to Company (via Palm) for employee salary as of 5/1". This payment is referred to herein as the "Palm Payment". BBI Ledger, **Exhibit 3**.

37.     The Palm Payment was made prior to the Board Resolution, but was not included in the Board Resolution as an approved loan to the Debtor.

38.     After taking into account approved surcharges, other approved administrative expenses, and this Court's Order which granted Grow Michigan a secured claim in the amount of $3.2 million and transferred Grow Michigan's avoided lien in the amount of $2,318,244.66 to the estate (Docket 461), the Trustee currently holds approximately $500,000 of sale proceeds from the sale of substantially all of Debtor's Assets (the "Proceeds").

39.     Pursuant to the order approving the sale of substantially all assets of the Debtor, the sale of Debtor's Assets was free and clear of any and all claims, interests, and liens of BBI, with any such claims, interests, and liens being transferred to the Proceeds.

40.     Any claim, interest, or lien of BBI, if any, now attaches to the Proceeds held by the Trustee in the same order and priority as such claim, interest or lien attached, if any all, prior to the Petition Date.

41.     BBI asserts that BBI has a Security Interest ("BBI Security Interest") in the Proceeds for the value of set forth in the BBI Proof of Claim.

42.     Any interest BBI has in the Proceeds, or any other assets of the bankruptcy estate, is avoidable as set forth below.

43.     The avoided security interest of Grow Michigan granted by this Court (Docket No. 461) is senior in priority in the Proceeds ahead of any claim by BBI.

### COUNT I:
### AVOIDANCE OF SECURITY INTEREST PURSUANT TO TO 11 U.S.C. § 547, RECOVERY UNDER 11 U.S.C. §550, AND PRESERVATION OF THE AVOIDED SECURITY INTEREST FOR THE BENEFIT OF THE ESTATE PURSUANT TO 11 U.S.C. § 551

44.     Plaintiff incorporates each and every other paragraph of this Complaint into this Count as though fully set forth herein.

45.     The Debtor's granting of a security interest to Defendant in the Debtor's Assets was a transfer of an interest of property of the Debtor (the "Transfer").

8

46.    The Transfer is deemed to have occurred upon the filing of the Delaware UCC-1 on January 29, 2021, the date the Transfer was perfected.

47.    The filing of the Michigan UCC-1 did not effectuate any perfection or attachment of a security interest by BBI over the Debtor's Assets as the Debtor is a Delaware corporation and a financing statement must be filed in Delaware to attach and perfect a security interest against a Delaware corporation.

48.    As such, the Transfer occurred within 90 days of the Petition Date of February 5, 2021.

49.    The Transfer was made to BBI, which is and was a creditor of the Debtor.

50.    The Transfer was made on account of an antecedent debt arising before the Transfer was made, being Debtor's outstanding obligations as authorized in the Board Resolution.

51.    Pursuant to 11 U.S.C. § 547(f), the Debtor is presumed to be insolvent at the time of the Transfer as it occurred within 90 days of the Petition Date.

52.    The Debtor was in fact insolvent on the date of the Transfer as the value of Debtor's liabilities exceeded the value of its assets, and the Debtor was not generally paying its bills as they became due.

53.    The Transfer enabled BBI to receive more than BBI would receive if the Transfer had not been made and BBI received payment of such debt in this case

9

(a Chapter 7 case). Specifically, the claims register reflects claims of over $15 million, approximately $10 million are filed as unsecured claims. The Trustee currently has no reason to believe that the Trustee will recover sufficient assets to pay all claimants in full.

54. The Transfer was made directly to BBI, rendering BBI the initial transferee of the lien that is the subject of the Transfer.

55. The Transfer is otherwise avoidable under 11 U.S.C. §547(b).

56. As a result of the avoidance of the Transfer under 11 U.S.C. § 547(b), Plaintiff is entitled to recover BBI's lien in the Debtor's Assets from BBI pursuant to 11 U.S.C. §550(a)(1).

57. The lien of BBI in Debtor's Assets being avoidable and recoverable by the Trustee, the BBI's lien in Debtor's Assets will be preserved for the benefit of the bankruptcy estate pursuant to 11 U.S.C. § 551.

58. As BBI's lien in the Debtor's Assets was transferred to the Proceeds, the Trustee, for and on behalf of the estate, has a recovered lien in the Proceeds equal to the lien BBI held against the Debtor's Assets and in the same order and priority as prior to the Petition Date.

WHEREFORE, Plaintiff requests that this Court enter judgment in her favor and against Defendant BBI Invescor, LLC that provides for the following:

A) The perfection through filing of the Delaware UCC-1 of the BBI Security Interest in the Debtor's Assets is avoidable by the Trustee pursuant to 11 U.S.C. § 547(b);

B) Notwithstanding the avoidance of the filing of the BBI Security Interest in Debtor's Assets through the filing of the Delaware UCC-1, the BBI Security Interest in Debtor's Assets is recovered from Defendant by the Trustee pursuant to 11 U.S.C. §550(a)(1);

C) The filing of the Michigan UCC-1 is of no effect;

D) The avoided BBI Security Interest is preserved for the benefit of the bankruptcy estate pursuant to 11 U.S.C. § 551;

E) The BBI Security Interest was transferred to the Proceeds upon the sale of the Debtor's Assets by the Trustee;

F) The Trustee, for and on behalf of the bankruptcy estate, has a preserved lien in the Proceeds equal to the lien BBI had in the Debtor's Assets;

G) The preserved lien held by the estate for the BBI Security Interest which has been avoided is subordinate to the preserved security interest and lien of Grow Michigan and Paul Shamo held by the estate;

H) Any claim that BBI may have against the Debtor's bankruptcy estate is limited to an unsecured claim only, with Plaintiff preserving all objections to any such claim filed by BBI, as to amount or otherwise; and

I) The granting of such other relief that this Court deems just and proper, including recovery of all taxable costs.

## COUNT II:
## OBJECTION TO BBI PROOF OF CLAIM

59.     Plaintiff incorporates each and every other paragraph of this Complaint into this Count as though fully set forth herein.

60.     The BBI Proof of Claim improperly seeks to recover from the estate for amounts paid by BBI which did not benefit the Debtor.

61.     The Letter Agreement Payments in the amount of $400,000 by BBI to Grow Michigan did not benefit the Debtor.

62.     The Letter Agreement Payments, by the terms of the Option Agreement and the Letter Agreement, were not applied to reduce the obligations of the Debtor to Grow Michigan.

63.     The H&H Payments in the amount of $383,137.89 by BBI to Grow Michigan did not benefit the Debtor.

12

64.     The H&H Payments, by the terms of the Option Agreement and the Letter Agreement, were not applied to reduce the obligations of the Debtor to Grow Michigan.

65.     The Foley 2020 Payments and the Foley 2021 Payment (collectively the "Foley Payments"), totaling $92,442.00, were made by BBI for the benefit of BBI and not for the benefit of the Debtor.

66.     In addition, the Foley 2020 Payments were made in May and June 2020 by BBI, but were not included in the loans approved in the Board Resolution as loans to the Debtor, despite the payments having been made prior to the August 24, 2020 Board meeting.

67.     The Board Resolution approved certain future financing to the Debtor but did not approve retroactive inclusion of funds by BBI such as the Foley 2020 Payments and the Palm Payment.

68.     The Palm Payment in the amount of $100,000 was not approved as obligations of the Debtor to BBI and did not occur subsequent to the Board Resolution which approved only future obligations of the Debtor relating to the emergency funding.

69.     The Palm Payment was made in May 2020 by BBI, but was not included in the loans approved in the Board Resolution as a loan to the Debtor,

despite the payment having been made prior to the August 24, 2020 Board meeting.

70.    BBI has no authority to include the Foley 2020 Payments or the Palm Payment as an obligation of the Debtor for which recovery is warranted from the estate.

71.    The BBI Proof of Claim should be reduced by the amount of at least $975,579.89 as BBI has no right to recover from the Debtor for the Letter Agreement Payments, the H&H Payments, the Foley Payments or the Palm Payment.

72.    Other objections to the amount of the BBI Proof of Claim may be discovered through discovery.  All objections not raised herein are preserved.

WHEREFORE, Plaintiff requests this Court enter an Order:

A) Allowing Defendant BBI Invescor, LLC's Proof of Claim No. 52 as an unsecured claim in the amount to be determined by the Court, but not greater than $1,298,307.48 ("BBI Unsecured Claim");

B) Disallowing the BBI Proof of Claim to the extent the BBI Proof of Claim exceeds the BBI Unsecured Claim;

C) Assuming the relief in Count I has been granted by the Court, holding that the lien preserved for the estate in Count I is in the amount of the BBI Unsecured Claim; and

D) Grant such other relief as the Court deems just and proper.

**THE TAUNT LAW FIRM**

By: <u>/s/ Erika D. Hart (P67457)</u>
Dean R. Nelson, Jr. (P70818)
Erika D. Hart (P67457)
Matthew L. Boyd (P73012)
Attorney for Trustee/Plaintiff
700 East Maple Road, Second Floor
Birmingham, MI 48009
(248) 644-7800
dnelson@tauntlaw.com
ehart@tauntlaw.com
mboyd@tauntlaw.com

Dated: February 2, 2023

## **Exhibit 1**

**Fill in this information to identify the case:**

Debtor 1   Lightning Technologies, Inc.

Debtor 2
(Spouse, if filing)

United States Bankruptcy Court   **Eastern District of Michigan**

Case number:  **21−41019**

FILED

**U.S. Bankruptcy Court
Eastern District of Michigan**

5/24/2021

**Todd M. Stickle, Clerk**

## Official Form 410
# Proof of Claim

04/19

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.

| **Part 1:** | **Identify the Claim** |
| --- | --- |

**1. Who is the current creditor?**

BB Invescor I, LLC

Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor

**2. Has this claim been acquired from someone else?**

☒ No
☐ Yes. From whom?

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

| Where should notices to the creditor be sent? | Where should payments to the creditor be sent? (if different) |
| --- | --- |
| BB Invescor I, LLC | |
| Name | Name |
| c/o Rinarisa Coronel DeFronze | |
| 445 Park Avenue, 16th Floor | |
| New York, NY 10022 | |
| Contact phone  917−445−5554 | Contact phone |
| Contact email  rcd@braviacapital.com | Contact email |

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

**4. Does this claim amend one already filed?**

☒ No
☐ Yes. Claim number on court claims registry (if known) _____   Filed on _____
MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☒ No
☐ Yes. Who made the earlier filing?

| | |
|---|---|
| 6. **Do you have any number you use to identify the debtor?** | ☑ No<br>☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: _____ |
| 7. **How much is the claim?** | $ 2273887.37<br><br>**Does this amount include interest or other charges?**<br>☑ No<br>☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A). |
| 8. **What is the basis of the claim?** | Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card. Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).<br>Limit disclosing information that is entitled to privacy, such as healthcare information.<br><br>Money loaned – 'Last In First Out' |
| 9. **Is all or part of the claim secured?** | ☐ No<br>☑ Yes. The claim is secured by a lien on property.<br>    **Nature of property:**<br>    ☐ Real estate.  If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410–A) with this *Proof of Claim.*<br>    ☐ Motor vehicle<br>    ☑ Other. Describe:   All assets of Debtor, of every kind<br><br>    **Basis for perfection:**   UCC Financing Statements<br><br>    Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)<br><br>    **Value of property:**   $ _____<br>    **Amount of the claim that is secured:**   $ 2273887.37<br>    **Amount of the claim that is unsecured:**   $ 0.00   (The sum of the secured and unsecured amounts should match the amount in line 7.)<br><br>    **Amount necessary to cure any default as of the date of the petition:**   $ 2273887.37<br><br>    **Annual Interest Rate** (when case was filed)   10.00  %<br>    ☑ Fixed<br>    ☐ Variable |
| 10. **Is this claim based on a lease?** | ☑ No<br>☐ Yes. **Amount necessary to cure any default as of the date of the petition.** $ _____ |
| 11. **Is this claim subject to a right of setoff?** | ☑ No<br>☐ Yes. Identify the property: _____ |

Official Form 410            Proof of Claim            page 2

| 12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)? | ☑ No | |
|---|---|---|
| | ☐ Yes. *Check all that apply:* | **Amount entitled to priority** |

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). $ _____

☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). $ _____

☐ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). $ _____

☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). $ _____

☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). $ _____

☐ Other. Specify subsection of 11 U.S.C. § 507(a)(_) that applies $ _____

\* Amounts are subject to adjustment on 4/1/22 and every 3 years after that for cases begun on or after the date of adjustment.

---

## Part 3: Sign Below

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157 and 3571.**

Check the appropriate box:

☐ I am the creditor.

☑ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this Proof of Claim serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this Proof of Claim and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date    5/24/2021

      MM / DD / YYYY

/s/ Rinarisa Coronel DeFronze

Signature

Print the name of the person who is completing and signing this claim:

| Name | Rinarisa Coronel DeFronze |
|---|---|
| | First name     Middle name     Last name |
| Title | Chief Legal Counsel and Chief Administrative Offic |
| Company | BB Invescor I, LLC |
| | Identify the corporate servicer as the company if the authorized agent is a servicer |
| Address | 445 Park Avenue, 16th Floor |
| | Number   Street |
| | New York, NY 10022 |
| | City   State   ZIP Code |
| Contact phone | 917–763–3191     Email    rcd@braviacapital.com |

**Fill in this information to identify the case:**

Debtor 1    Lightning Technologies, Inc.

Debtor 2 _____
(Spouse, if filing)

United States Bankruptcy Court for the:   Eastern District of Michigan

Case number   21-41019-tjt _____

Official Form 410

# Proof of Claim

04/19

**Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.**

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309)** that you received.

| Part 1: | Identify the Claim |
| --- | --- |

**1. Who is the current creditor?**

BB Invescor I, LLC
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor   BB Invescor, BBI

**2. Has this claim been acquired from someone else?**

☑ No
☐ Yes. From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

**Where should notices to the creditor be sent?**

c/o Rinarisa Coronel DeFronze
Name

445 Park Avenue, 16th Floor
Number    Street

New York     NY     10022
City     State     ZIP Code

Contact phone   1-917-445-5554

Contact email   rcd@braviacapital.com

**Where should payments to the creditor be sent?** (if different)

_____
Name

_____
Number    Street

_____
City     State     ZIP Code

Contact phone _____

Contact email _____

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

__ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __

**4. Does this claim amend one already filed?**

☑ No
☐ Yes. Claim number on court claims registry (if known) _____

Filed on _____
    MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☑ No
☐ Yes. Who made the earlier filing? _____

**Part 2: Give Information About the Claim as of the Date the Case Was Filed**

**6. Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____

**7. How much is the claim?** $ _____2,273,887.37 **. Does this amount include interest or other charges?**

☑ No

☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

Money loaned - "Last In First Out"

**9. Is all or part of the claim secured?**

☐ No

☑ Yes. The claim is secured by a lien on property.

Nature of property:

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim*.

☐ Motor vehicle

☑ Other. Describe: All assets of Debtor, of every kind and nature.

Basis for perfection: UCC Financing Statements

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

Value of property: $ _____

Amount of the claim that is secured: $ ____2,273,887.37

Amount of the claim that is unsecured: $ _____0.00 (The sum of the secured and unsecured amounts should match the amount in line 7.)

Amount necessary to cure any default as of the date of the petition: $ ____2,273,887.37

Annual Interest Rate (when case was filed) 10.00 % for convertible notes.

☑ Fixed

☐ Variable

**10. Is this claim based on a lease?**

☑ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.** $ _____

**11. Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

**12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☑ No

☐ Yes. *Check one:*

| | Amount entitled to priority |
|---|---|
| ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| ☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| ☐ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies. | $_____ |

\* Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment.

---

| **Part 3:** | **Sign Below** |
|---|---|

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☐ I am the creditor.

☑ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date  05/24/2021
              MM / DD / YYYY

*Rinarisa Coronel DeFronze*
Signature

**Print the name of the person who is completing and signing this claim:**

| Name | Rinarisa | Coronel | DeFronze |
|---|---|---|---|
| | First name | Middle name | Last name |

| Title | Chief Legal Counsel and Chief Administrative Officer |
|---|---|

| Company | BB Invescor I, LLC |
|---|---|
| | Identify the corporate servicer as the company if the authorized agent is a servicer. |

| Address | 445 Park Avenue, 16th Floor |
|---|---|
| | Number        Street |
| | New York                    NY        10022 |
| | City                        State     ZIP Code |

| Contact phone | 1-917-763-3191 | Email | rcd@braviacapital.com |
|---|---|---|---|

<u>**Addendum**</u>

<u>**Claim of BB Invescor I, LLC**</u>

**I.      Claim and Security**

The claim of BB Invescor I, LLC ("BB") is approved and authorized pursuant to that certain Subordination Agreement dated November 19, 2020 executed by BB, Lightning Technologies Inc. ("Debtor"), and Grow Michigan, LLC and that certain Board of Directors-Resolution adopted by the Board of Directors of Debtor on August 24, 2020, and is secured by a timely filed UCC-1 Financing Statement filed on January 29, 2021 with the Delaware Department of State Document No. 2021 0775883 naming Debtor as debtor and BB as secured creditor and securing a security interest in "All Assets of Debtor, of every kind and nature, now existing and hereafter acquiring and arising and wherever located." ("Delaware Financing Statement").  BB is also secured by a timely filed UCC-1 Financing Statement filed on October 31, 2020 with the Michigan Department of State Document No. 20201031000047-6 naming Debtor as the debtor and BB as secured creditor and securing a security interest in "All Assets of Debtor, of every kind and nature, now existing and hereafter acquiring and arising and wherever located." ("Michigan Financing Statement").  Copies of the Delaware Financing Statement and Michigan Financing Statement are attached hereto as **<u>Exhibit A</u>**.

**II.      Reservation of Rights**

This Proof of Claim is without prejudice to BB's right to claim interest, fees or other expenses, accrued after the Petition Date.  This Proof of Claim is without prejudice to the right of BB to assert a claim for such interest, fees and/or other expenses under section 506(b) of the Bankruptcy Code, or otherwise.

This Proof of Claim includes and expressly preserves any and all rights and/or claims that BB had, has, or may have with respect to transactions with the Debtor and any of its affiliates.

4837-8409-6491.2

23-04055-tjt Doc 21 Filed 02/02/23 Entered 02/02/23 14:12:54 Page 94 of 78
Case 21-41019-mlo Claim 52 Filed 05/24/23 Page 23 of 67

BB expressly reserves the right to: (i) alter, amend, update, modify, supplement or otherwise revise this Proof of Claim in any respect at any time; (ii) file additional Proofs of Claim for any other liability or indebtedness of the Debtor, whether based on the same or additional documents or otherwise; and (iii) file a motion for allowance of an administrative expense claim as appropriate. BB specifically preserves all of its procedural and substantive defenses, counterclaims, and rights with respect to any claim that may be (or has been) asserted against BB by the Debtor or any other party in interest in the Debtor's bankruptcy case, or any other person or entity whatsoever, including without limitation any challenge or defense to the jurisdiction of this Court over any such claim.

The filing of this Proof of Claim is not and should not be construed to be: (i) a waiver or release of BB's rights against any other person liable for all or part of any claim described herein; (ii) a waiver of the right to seek to have the reference withdrawn with respect to any proceedings commenced in this case against or otherwise involving BB (including without limitation with respect to any counterclaims to the claims asserted in this Proof of Claim); or (iii) an election of remedies which waives or otherwise affects any other remedy of BB.

Without limiting the foregoing, BB does not hereby waive and expressly preserves arguments that any of the claims described herein were already paid, are prepetition claims or postpetition claims, that such claims are entitled to administrative priority or secured or unsecured, that such claims are obligations of the Debtor or any other party for any reason, and that such claims arise under the documents attached or other documents (including documents already in the possession of the Debtor and its affiliates) or understandings.

**EXHIBIT A**

# UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS

| A. NAME & PHONE OF CONTACT AT FILER (optional) |
| --- |
| B. E-MAIL CONTACT AT FILER (optional) |
| C. SEND ACKNOWLEDGEMENT TO:  (Name and Address) |

Return acknowledgment to:

Capitol Services, Inc.
1675 S State Street Suite B, Dover, DE 19901
800/316-6660

**Delaware Department of State**
**U.C.C. Filing Section**
**Filed: 06:19 PM 01/29/2021**
**U.C.C. Initial Filing No: 2021 0775883**

**Service Request No:   20210276210**

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | |
| --- | --- | --- | --- | --- |
| **Lightning Technologies Inc.** | | | | |
| OR  1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 1c MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| **2171 Xcelsior Dr.** | **Oxford** | **MI** | **48371** | **USA** |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
| --- | --- | --- | --- | --- |
| OR  2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME OF ASSIGNEE OF ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
| --- | --- | --- | --- | --- |
| **BB Invescor I, LLC** | | | | |
| OR  3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| **445 Park Ave  20th Floor** | **New York** | **NY** | **10022** | **USA** |

4. COLLATERAL:  This financing statement covers the following collateral:

All Assets of Debtor, of every kind and nature, now existing and hereafter acquired and arising and wherever located.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility
6b. Check only if applicable and check only one box:
☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
To be filed with the Delaware Secretary of State

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

████████████████████
████████████████████
████████████████████
████████████████████

# UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

Michigan Department of State - Uniform Commercial Code

**Filing Number: 20201031000047-6**

Filing Date and Time: 10/31/2020 08:14 AM

Total Number of Pages: 1

*(This document was filed electronically)*

| A. NAME & PHONE OF CONTACT AT FILER (optional) |
|---|
| **Law Office of Aaron M. Fales, P.C.** |

| B. E-MAIL CONTACT AT FILER (optional) |
|---|
| **afaleslaw@gmail.com** |

| C. SEND ACKNOWLEDGMENT TO: (Name and Address) |
|---|
| **Law Office of Aaron M. Fales, P.C.** |
| **1080 Canyon Creek Dr.** |
| **Rochester, MI 48306 USA** |

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ⬚ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| **Lightning Technologies Inc.** | | | | |
| OR 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| | | | | |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| **2171 Xcelsior Dr.** | **Oxford** | **MI** | **48371** | **USA** |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ⬚ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| | | | | |
| OR 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| | | | | |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| | | | | |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| **BB Invescor I, LLC** | | | | |
| OR 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| | | | | |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| **445 Park Ave 20th Floor** | **New York** | **NY** | **10022** | **USA** |

4. COLLATERAL: This financing statement covers the following collateral:
   All Assets of Debtor, of every kind and nature, now existing and hereafter acquired and arising and wherever located.

5. Check only if applicable and check only one box: Collateral is ⬚ held in a Trust (see UCC1Ad, item 17 and Instructions) ⬚ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box: ⬚ Public-Finance Transaction ⬚ Manufactured-Home Transaction ⬚ A Debtor is a Transmitting Utility     6b. Check only if applicable and check only one box: ⬚ Agricultural Lien ⬚ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ⬚ Lessee/Lessor ⬚ Consignee/Consignor ⬚ Seller/Buyer ⬚ Bailee/Bailor ⬚ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:

**FILING OFFICE COPY** — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

## Exhibit 2



Board Meeting Minutes

[Zoom Teleconference]

August 24th,2020 12:00 pm (Noon) EST

1. **Call to Order** - Mr. Bhise called the Meeting to Order at 12:00 PM.
2. **Attendance and Roll Call -** (12:01 PM) Mr. Bhise confirmed all members of the Board were present: Mr. Heiberger, Mr. Owen, Mr. MacDonald, Mr. Treadwell, Mr. Campbell, Ms. DeFronze, and himself plus Mr. Rendeiro (counsel), Mr. Barry (Interim CFO & Treasurer), and Mr. Fales (recording Minutes).
3. **Confirmation of Quorum** - (12:03 PM) A Quorum was confirmed.
4. **Approval of the prior Board Minutes from August 17th, 2020.**

   **Motion** by Mr. Bhise to Approve the Minutes from the August 17, 2020 Board Meeting. Seconded by Mr. Owen.  All in favor no dissent.  **Motion carries 7-0.**

   <u>OLD Business:</u>

5. **Confirmation that Directors are in receipt of the "Overview of Duties" memorandum, previously emailed on 8/14/20 (not covered at last meeting).** (12:04 PM)

   Mr. Bhise sought confirmation that all directors had received and read the Memo prepared by Counsel to the Board.  Each Director confirmed they did receive and read. Mr. Rendeiro explained the memo to Board and responded to Mr. Campbell's questions regarding who requested the Memo and what Information can be shared.  Discussion ensued.

6. **Profit Interest Grants – Review Opinion from Counsel, Ratify Unqualified Stock Plan & Issuance of Options.** (12:12 PM)

   Mr. Rendeiro discussed his firm's legal opinion on this matter.  Discussions ensued.

7. **Del Morgan Contract(s) cancellation discussion.** (12:15 PM)

   Mr. Bhise discussed that the Board previously agreed to cancel the Del Morgan Agreement at its prior Meeting.  Mr. Rendeiro discussed the Termination Letter and confirmed it was sent today August 24th.  Discussions ensued.  Mr. Campbell asked If we

1

have any chance of recovering the $100,000 fee paid in connection with the contract or if they should opine on the Neat's Term Sheet. Mr. Barry said It would be unlikely and that the timing would not be conducive. Mr. Treadwell noted he has been Involved In similar circumstance and wanted the record to reflect this was discussed and that the Board does not view this as a productive exercise at this juncture. The Board agreed not to pursue Del Morgan's opinion.

8. **Common Class B Stock - Review and discuss legal opinion.** (12:29 PM)

Mr. Rendeiro presented his firm's opinion. Discussion ensued regarding the following options 1) extending additional time 2) rescinding unsatisfied contracts or 3) do nothing. Mr. Bhise recommended giving 45 days. Mr. Owen recommended 30 days or no later than October 1, 2020.

**Motion** by Ms. DeFronze to grant 30 days from today for Common Class B Subscriber's to pay and fulfill their Contracts. Mr. Owen Seconded. All In favor. **Motion carries 6-0.** Mr. Treadwell was in support but given he Is not fully up to speed he abstained from this vote.

9. **ROFR Rights - Stock Option Contracts (Company needs to issue ROFR to Shareholders).** (12:37 PM)

Mr. Rendeiro discussed the need for the Company to Issue a secondary ROFR to the shareholders as well as notice to Mr. Castellano that the Company would not be exercising Its ROFR to purchase the shares. Discussion ensued. Mr. Bhise recommended confirming the Company's disinterest in exercising the ROFR and notifying the other shareholders of their rights to Purchase. Mr. Owen recommended sending out the Notice ASAP.

10. **LIFO Funding Resolution Discussion.** (12:43 PM)

Mr. Fales and Mr. Rendeiro discussed the proposed resolution to the Board to effectuate the agreed upon "Emergency Funding" for the Company. Mr. Treadwell sought clarity of where the debt would be in the priority or repayment. Mr. Bhise stated It would be subordinated to Grow MI. Mr. Rendeiro added the Resolution has language addressing this point and agreed to circulate ASAP. Mr. Barry added that he is unaware of any other lenders that would need to approve this. Ms. DeFronze asked Mr. Owen If there has been any Shareholders who have expressed Interest In joining the Emergency Funding. Mr. Owen stated he has only been contacted by one Investor who respectfully declined.

**Motion** by Mr. Treadwell to approve the Emergency Funding Resolution (a copy of which Is attached hereto) as presented. Seconded by Mr. Owen. All in Favor. **Motion Carries 7-0.**

2

**11. Funding /Financing Proposals:** (12:53 PM)
   a. **Naets Group Term Sheet discussion and vote**
   b. **Draft License Agreement - discussion**
   c. **Discussion of 1% Shareholder Analysis**

Mr. Barry presented the Term Sheet, draft license, and shareholder analysis and timing implications. He also pointed out the new deal with the Silverbell Landlord and emphasized the timing and need for payments by 9/1/20 and for the next five months following or else we would be removed. Mr. Treadwell asked questions regarding the flow of funds to clarify all liabilities of LT should be paid prior to any distributions to Shareholders. Mr. Barry agreed. Mr. Treadwell asked what the Company execution risk Is to get to the second tranche of funding. Mr. MacDonald discussed. Mr. Treadwell also asked if this transfer needs Shareholder approval. Discussions ensued.

**Motion** by Mr. Bhise to enter into the Neat's Term sheet as last circulated and to allow the negotiations regarding the draft License to be negotiated with the Termination provisions as desired by the board to protect the Company IP. Seconded by Ms. DeFronze. All In favor. **Motion Carries 7-0.**

**12. Legal Update:**
   a. **Discussion of various lawsuits recently served/filed and open, new responses:**
      1) **Del Morgan Contract review and breach letter** - Addressed under point 7.
      2) **Grow Michigan (Receivership, Drake, RICO)** - (1:13 PM) Mr. Rendeiro discussed that his firm has appeared into the matter and that they are proceeding accordingly. He discussed the fact that another attorney, Mr. Adolf, appeared in previously and asserted counterclaims that were not authorized by the Company. He advised he will keep the Board and Management apprised as he knows/learns/more.
      3) **Shamo** - (1:19 PM) Mr. Bhise discussed this matter in general pointing out it was not approved by the Board.
      4) **Solyco et al (Solyco/McClear/Khachatrian/George/Cauley/Verdun) Global Settlement – Garcia discussion** - Mr. Bhise discussed the total sum of these disputes are roughly $2 Mil In total (Including Shamo), and that they are also subject to dispute and Mr. Rendeiro's firm Is to handle.
      5) **Excelsior update, Silverbell updated payment plan** - (1:23 PM) Mr. Barry Informed the Board of the payment plan entered Into with the Silverbell landlord. Mr. Owen discussed he would work with Paul to try to work out a deal with this Landlord.
      6) **Lightning Pooling Inc. -** (1:25 PM) Mr. Rendeiro discussed the need to hold an annual meeting to button up some corporate Issues as it relates to Lightning Pooling Inc. Discussions ensued.

3

**Motion** by Mr. Treadwell to keep Jeff Owen as Director for Lightning Pooling Inc. and to authorize Mr. Owen to act on behalf of Lightning Technologies Inc. as It relates to any Issues regarding Lightning Pooling Inc. Seconded by Mr. Bhise. All In favor. **Motion carries 7-0.**

## NEW Business

13. **Discussion regarding employee terminations/furloughs.** (1:30 PM)

Mr. Owen advised the Board that certain employees are still furloughed, some have been called back, and others should be terminated and that he would keep the Board apprised accordingly.

14. **Discussion regarding valuation of Company** (1:33 PM)

Mr. Barry apprised the Board that the valuation projects have been kicked off with Reymann and Doreen Mayhew to value the company. This valuation can be used to underpin the Neat's deal as well as peg a market for the Stock Options. Discussions ensued.

15. **Updates/Industry Trends/Other** (1:36 PM) Mr. MacDonald and Mr. Owen discussed updates.

16. **Date and scheduling of next Board meeting.** The next Board Meeting Is scheduled for 11 AM Friday, August 28, 2020.

17. **Closing Remarks and Adjourn Meeting.** Mr. Bhise thanked everyone for attending and adjourned the Meeting at 1:43 PM.

# Lightning Technologies, Inc.

## Board of Directors - Resolution

At a duly called meeting of the Board of Directors (the "Board") of Lightning Technologies, Inc., a Delaware Corporation (the "Company"), and pursuant to general corporate laws of the state of Delaware (the "Act"), a majority of the directors adopted following resolution on August 24, 2020, and the same are now in full force and effect:

**WHEREAS**, the Company desires to enter into an agreement to ratify, confirm and approve the certain rights and obligations regarding Emergency Financing of the Company.

**WHEREAS**, the Company currently lacks sufficient funds to pay it obligations and has had to borrow additional funds since March 17, 2020 to pay minimum Company obligations.

**WHEREAS**, the Company will likely need to continue to borrow additional funds in the short term to bridge it until it is able to resolving pending litigation, restructure, and or place new debt or equity accordingly.

**WHEREAS**, the current litigation facing the Company has made its ability to raise new funding difficult, if not impossible outside of its existing shareholders.

**NOW, THEREFORE, BE IT RESOLVED,** that the Company Officers shall have the ability to enter into and accept bridge financing (the, "Emergency Financing") from any current investors of the Company (defined as any current shareholders of Lighting Technologies, Inc.) willing to loan money to the Company, subject to GrowMI's approval and subordinated to GrowMI's debt and subject to any approval rights the Company previously granted to any other individuals or entities (if any), in amounts and at times as reasonably required by the Company Officers not to exceed $1,500,000 (less any sums identified on Exhibit A). Any such Emergency Financing shall be approved by at least two Officers and attached hereto as incurred. The Board shall retain the right to revoke, modify, or terminate this resolution at any time.

**BE IT FURTHER RESOLVED,** the Company acknowledges and agrees that any such Emergency Financing provided since March 17, 2020 is also approved, acknowledged, ratified and subject to this Resolution (a list of which is attached hereto as Exhibit A).

**BE IT FURTHER RESOLVED,** the Company acknowledges and agrees that, to the fullest extent permitted by applicable law and to the fullest extent permitted by any existing contractual obligations owed by the Company to any other individual or entity (if any), any such Emergency Financing shall have a priority of repayment above and before any other debts or obligations of the company, excepting only the Senior Lender (GrowMI) debt, and shall be treated as Last In First Out ("LIFO") Emergency Financing. This Emergency Financing shall also be permitted a 6% annual interest rate of return.

**BE IT FURTHER RESOLVED,** the Company acknowledges and agrees that any such Emergency Financing is hereby permitted, adopted, ratified and approved by the Board and each hereby consents to the adoption of this resolution.

Resolution 8/24/20 Board Meeting – Emergency Financing

**THE UNDERSIGNED** certifies that the Board the approved the foregoing resolutions during a duly called meeting of the Board on August 24, 2020 by a vote of ☒ YES. __NO and __ ABSTAIN. This Resolution shall be filed with the Meeting Minutes of the Board.

**SECRETARY:**

Rich MacDonald

Date:

08. 24. 2020

Resolution 8/24/20 Board Meeting – Emergency Financing

**BB Advances for LT as of August 24, 2020**

| | Date | |
|---|---|---|
| Salary and Expenses | 3/31/20 | 231,000.00 |
| GM Interest | 4/3/20 | 41,184.00 |
| D&O Insurance dowpayment | 6/24/20 | 9,432.47 |
| D&O Insurance July 2020 Payment | 7/23/20 | 2,986.71 |
| D&O Insurance August 2020 Payment | 8/22/20 | 2,986.71 |
| Salary loan to Employees | on 7/17, 7/24, 7/31 | 284,871.00 |
| Rent Payment to Ashley Capital | 7/31/20 | 108,903.00 |
| Blue Cross Blue Shield | 8/11/20 | 14,277.32 |
| DTE | 8/11/20 | 7,787.38 |
| Consumer Energy | 8/11/20 | 12,146.98 |
| Spectrum | 8/11/20 | 383.46 |
| Comcast | 8/13/20 | 934.30 |
| Chubb | 8/14/20 | 4,929.20 |
| Xcelsior August Rent | 8/21/20 | 23,883.33 |
| Xcelsior Property Tax for 2020 | 8/21/20 | 9,633.00 |
| Thomas Rent | 8/21/20 | 2,900.00 |
| GM Legal costs as of 5/28 | 5/28/20 | 172,701.93 |
| GM Legal costs as of 5/28 - 6/30 | 8/24/20 | 81,862.80 |
| **Total** | | **1,012,803.59** |

**$4,929.20**

# **Exhibit 3**

**BB Advances for LT as of May 18, 2021**

| | Date | |
|---|---|---|
| Salary and Expenses | 3/31/2020 | 257,180.00 |
| GM Interest | 4/3/2020 | 45,828.64 |
| D&O Insurance dowpayment | 6/24/2020 | 9,432.47 |
| D&O Insurance July 2020 Payment (Premco) | 7/23/2020 | 2,986.71 |
| D&O Insurance August 2020 Payment | 8/22/2020 | 2,986.71 |
| Employee Salaries | on 7/17, 7/24, 7/31 | 284,871.00 |
| Rent Payment to Ashley Capital | 7/31/2020 | 108,903.00 |
| Blue Cross Blue Shield | 8/11/2020 | 14,277.32 |
| DTE | 8/11/2020 | 7,787.38 |
| Consumer Energy | 8/11/2020 | 12,146.98 |
| Spectrum | 8/11/2020 | 383.46 |
| Comcast | 8/13/2020 | 934.30 |
| Chubb | 8/25/2020 | 4,929.20 |
| Xcelsior August Rent | 8/21/2020 | 23,883.33 |
| Xcelsior Property Tax for 2020 | 8/21/2020 | 9,633.00 |
| Thomas Rent | 8/21/2020 | 2,900.00 |
| Brooks Kushman PC legal bill #754216 3/31/2020 | 8/25/2020 | 3,053.67 |
| Jeff's Business Expenses on Amex | 8/28/2020 | 21,658.05 |
| Retainer to Dooren Mayhew, valuation report | 8/31/2020 | 5,000.00 |
| Payment to MEDITERRANEAN SHIPPING CO | 8/31/2020 | 27,780.00 |
| Rental Payment for Ashley & Silverbell Facility | 9/1/2020 | 235,132.09 |
| Loan to Company (via Palm) for employee salary as of 9 | 5/4/2020 | 100,000.00 |
| Foley #50003250 SEC AND FINRA Advice | 5/19/2020 | 8,701.00 |
| Foley #50028428 SEC AND FINRA Advice | 6/20/2020 | 21,923.50 |
| Foley Invoice # 50048069 GM Note Review | 4/28/2021 | 61,817.50 |
| Brooks Kushman P.C IP and Licensing Advice | 9/10/2020 | 5,000.00 |
| Cixtrix Systems | 9/14/2020 | 1,275.18 |
| Rent to DEMS | 9/16/2020 | 50,000.00 |
| Inventory Insurance Premium Cincinnati Insurance | 9/16/2020 | 5,873.00 |
| October Employ Salaries | 9/28/2020 | 65,250.00 |
| Aaron's August invoice, Matter 2 | 9/25/2020 | 5,931.25 |
| Rich McDonald Expense Reimbursement | 10/8/2020 | 12,446.43 |
| Aaron's September invoice, Matter 2 | 10/29/2020 | 3,737.50 |
| D&O Insurance September 2020 Payment (Premco) | 9/23/2020 | 2,986.71 |
| D&O Insurance October 2020 Payment | 10/23/2020 | 2,986.71 |
| Crown Forklift | 11/19/2020 | 17,379.51 |
| Xcelsior rent downpayment to DEMS | 11/19/2020 | 30,000.00 |
| D&O Insurance November 2020 Payment | 11/23/2020 | 2,986.71 |
| Aaron's October invoice, Matter 2 | 11/24/2020 | 2,681.25 |
| D&O Insurance December 2020 Payment | 12/20/2020 | 2,986.71 |
| Aaron Invoice November 2020, Matter 2 | 1/4/2021 | 1,056.25 |
| Aaron Invoice December 2020, Matter 2 | 1/4/2021 | 1,056.25 |
| D&O Insurance January 2021 Payment | 1/17/2021 | 2,986.71 |
| **Total Expenses** | | **1,490,749.48** |

**Legal Fees Paid to GM**

| | | |
|---|---|---|
| GM Legal costs as of 5/28 (included in initial option payr | 5/28/2020 | 172,701.93 |
| GM Legal costs as of 5/28 - 6/30 | 8/24/2020 | 81,862.80 |
| GM July legal cost | 9/30/2020 | 96,460.16 |
| GM August legal cost | 10/16/2020 | 32,113.00 |
| **Total Legal Fees** | | **383,137.89** |

**Payments made to GM under option agreement/ revised option agreement**

| | | |
|---|---|---|
| Weekly payments under revised option agreement (4 x 100k) | | **400,000.00** |

| | | |
|---|---|---|
| **Total LIFO Amount** | | **2,273,887.37** |

\* Bravia pays all of its outstanding invoices from Foley in order of aging. So far, $50,000 has been applied to this particular invoice. Bravia intends to pay it in full.

**Exhibit 4**

# LOAN PURCHASE OPTION AGREEMENT

Loan Purchase Option Agreement ("Agreement") dated May 28, 2020 (the "Effective Date") between BB Invescor I, LLC, a Delaware limited liability company ("BB") and Grow Michigan, LLC, a Michigan limited liability company ("GM").

## RECITALS:

A.      Pursuant to that certain Business Loan Agreement, dated August 30, 2019 (the "Loan Agreement"), GM made a loan (the "Loan") to Lightning Technologies, Inc. ("Borrower").  The Loan is secured by a security interest in all of Borrower's tangible and intangible assets, pursuant to the terms of that certain Security Agreement, dated August 30, 2019, between Borrower and GM, and that certain Intellectual Property Security Agreement, dated August 30, 2019, between Borrower and GM, such tangible and intangible assets and other property of Borrower described in such agreements and the other Loan Documents is collectively referred to herein as the "Collateral". The obligations of Borrower to GM are guaranteed under a certain Guaranty (the "Pooling Guaranty") dated August 30, 2019, by Lightning Pooling, Inc. ("Pooling") in favor of GM and that certain Guaranty (the "Owen Guaranty", together with the Pooling Guaranty, the "Guarantees") dated August 30, 2019, by Jeffrey Owen (Owen, together with Pooling, the "Guarantors") in favor of GM.

B.      The Loan is evidenced by that certain Promissory Note dated August 30, 2019 in an original principal amount of $5,000,000.00 (the "Note").  The outstanding balance under the Note as of the Effective Date is as follows (collectively, the "Current Balance"):

| | | |
|---|---|---:|
| Principal Balance | | $3,400,063.85 |
| Accrued Interest | | $ 189,459.12 |
| Annual Fee | | $ 150,000.00 |
| Legal Fees | | $ 172,701.93 |
| | **Total** | **$3,912,224.90** |

C.      The Note, the Guarantees, and the other documents listed on the attached Exhibit A are referred to collectively as the "Loan Documents."

The parties agree as follows:

1.      Subject to the terms and conditions of this Agreement, on the Effective Date:

      (a)      BB

            (i)      shall pay GM an amount equal to Nine Hundred Sixty Five Thousand Five Hundred Eighty Nine and 05/100 Dollars ($965,589.05), which amount is (A) the Current Balance, *plus* (B) the principal and interest scheduled to be paid by Borrower under the Note during the six (6) month period following the Effective Date *less* (C) the outstanding principal amount of the Loan, in accordance with the wire instructions attached as Exhibit D; provided, however, inasmuch as the legal fees which

are included within the Current Balance provide for an estimate of GM's legal fees for the period from May 1, 2020 through the Effective Date in the amount of Fifty Five Thousand Dollars ($55,000.00), in the event that the legal fees for such period are less than such estimate, then GM shall promptly reimburse BB for the difference and in the event that the legal fees for such period are greater than such estimate then BB shall promptly pay GM for the difference;

(ii)    shall, at all times after the Effective Date pay GM when due pursuant to the Loan Documents (to the extent not previously paid by or on behalf of Borrower) all Post Effective Date Costs (as defined below) accruing up to the earlier of (A) the Closing Date (as defined below), and (B) the date on which the Option shall have expired or terminated; provided, that, with respect to GM's legal fees, such shall be paid within fifteen (15) days after the written request by GM, which request shall include copies of the invoices in respect thereof; and

(iii)`    shall, on or before (A) the fifteenth (15th) day, and (B) the last day, of each calendar month following the Effective Date, until the earlier of (X) the Closing Date (as defined below), and (Y) the date on which the Option shall have expired or terminated, deliver a report to GM with respect to the status of BB's efforts to raise funds in order to exercise the Option (as defined below).

Any amounts paid by BB to GM pursuant to this Section 1(a) and, to extend the exercise period for the exercise of the Option, pursuant to Section 1(b)(i) below, are hereinafter referred to as the "Option Payment."

(b)    GM

(i)    hereby grants to BB an option to purchase (the "Option") from GM all, but not less than all, of GM's interest in the Loan Documents and all rights and claims that GM has against any person or entity related to any such Loan Documents (the "Loan Documents and Claims"). Except as provided in Section 1(b)(ii) hereof, the Option shall remain outstanding, and may be exercised by BB at any time prior to the later of (i) November 30, 2020, or (ii) February 28, 2021, if prior to November 30, 2020, BB provides GM written notice of its election to extend the Option to not later than February 28, 2021 and BB shall, simultaneously with such notice, deliver to GM, an amount equal to the principal and interest (excluding any increased amount of interest charged as a consequence of any default) that will be payable by Borrower for the period from December 1, 2020 through February 28, 2021, and reaffirm its obligations to pay the Post Effective Date Costs for such period, in either case, by delivering to GM written notice of BB's exercise of the Option (the "Option Notice") stating the date (the "Closing Date") on which the purchase of the Loan Documents and Claims shall occur which shall not be more than thirty (30) days after delivery of the written notice of exercise provided, however, that, notwithstanding the foregoing, commencing after the ninetieth (90th) day following the Effective Date (A) in the event that BB is in default hereunder (after having received written notice of such default from GM and five (5) business days to cure such default), then, in such event, the Option shall automatically terminate immediately and be of no further force and effect and GM shall not be obligated to refund the Option

Payment to BB; or (B) in the event that GM determines that a Material Adverse Effect exists, GM may provide BB written notice thereof and thirty (30) days to exercise the Option. If BB so exercises the Option, then such purchase shall be consummated within ten (10) business days after such notice of exercise. If BB fails to exercise the Option within such period, then this Agreement and the Option shall automatically terminate immediately, in which event, the Option shall be of no further force and effect, GM shall not be obligated to refund the Option Payment to BB, and GM shall be entitled to exercise all of its rights and remedies under the Loan Documents. For purposes of this Agreement, a "Material Adverse Effect" means any act, event, condition or circumstance existing after the Effective Date which has had or could reasonably be expected to have a material adverse effect on (i) the business, operations, condition (financial or otherwise), performance, prospects, assets or liabilities of Borrower, (ii) the ability of Borrower to perform its obligations under any Loan Document to which it is a party or by which it is bound, or the enforceability of any Loan Document or any rights or remedies of GM under the Loan Documents, or (iii) Borrower's interest in, or the value, perfection or priority of GM's security interest or lien in any Collateral or the ability of GM to realize on any Collateral.

(ii)    For a period of ninety (90) days following the Effective Date, GM covenants and agrees not to sell, pledge, encumber, transfer, lease or otherwise dispose of the Loan Documents and Claims to any person other than BB (or its designee). During the period from and after the expiration of such ninety (90) day period and continuing thereafter for the period that the Option is outstanding, in the event that GM (A) determines that a Material Adverse Effect has occurred, and (B) BB is not in default hereunder (after having received written notice of such default from GM and five (5) business days to cure such default), GM covenants and agrees not to sell, pledge, encumber, transfer, lease or otherwise dispose of the Loan Documents and Claims to any person (other than BB or its designee) without providing BB written notice thereof and thirty (30) days to exercise a right of first refusal to purchase the same upon substantially the same terms and conditions offered to such third party. If BB exercises such right of first refusal then such purchase shall be consummated within ten (10) business days after the notice of such exercise. If BB fails to exercise such right of first refusal, then subject to Section 5 hereof, GM shall be free to sell the same to such third party upon substantially the same terms and conditions as offered to BB. After the ninetieth (90th) day following the Effective Date, nothing contained herein shall at any time preclude GM from exercising any of its other rights or remedies under the Loan Documents if it determines that a Material Adverse Effect has occurred or if the Option has expired or is terminated, including, without limitation, the right to foreclose on its liens on and security interests in the Collateral, pursue litigation against Borrower and the Guarantors or otherwise enforce it rights thereunder.

(iii)    shall hold the Option Payment, and shall not apply any part thereof to amounts then due and owing under the Note or any Loan Document, such that all payment defaults and payment obligations of Borrower thereunder remain outstanding, but rather the Option Payment shall be payments in consideration of the granting of the

3

4817-6810-2076.6

Option and applied to the Purchase Price at Closing, retained by GM or refunded to BB as provided herein; and

(iv)     (A) shall dismiss, without prejudice, Case Number 2020-180564-CB filed by GM in the Circuit Court of Oakland County, Michigan and (B) hereby agrees not to (1) appoint any receiver for Borrower or any asset of Borrower, (2) file any involuntary bankruptcy proceeding in respect of Borrower, or (3) file for injunctive relief against Borrower unless and until the earlier of (x) the Closing Date (as defined below), and (y) the date on which the Option shall have expired or terminated.

In the event that GM is in default hereunder (after having received written notice of such default from BB and five (5) business days to cure such default), then, upon written notice by BB to GM, (a) the Option shall terminate and (b) BB shall be entitled to an immediate refund of the Option Payment; provided, however, subject to Section 1(b)(i) hereof, if the basis of such default is that GM has improperly or wrongly declared a Material Adverse Event or other event of default, then BB's remedy will not necessarily or automatically be a refund of the Option Payment, but rather whatever remedy a court of competent jurisdiction may fashion and award.

2.     Following the exercise of the Option, on the Closing Date,

(a)     BB (or its designee) shall pay the purchase price (the "Purchase Price") for the Loan Documents and Claims, calculated, without duplication, as the sum of the (i) the Current Balance, *plus* (ii) all accrued interest on the Loan from the Effective Date through the Closing Date (excluding any increased amount of interest charged as a consequence of any default) that has not been paid to GM by Borrower, *plus* (iii) the Post Effective Date Costs, *less* (iv) the amount of the Option Payment actually paid by BB. For purposes hereof, the "Post Effective Date Costs" means the sum of (a) all costs and expenses (including attorneys' fees) related to the Loan accruing after the Effective Date that have not been paid to GM by Borrower, (b) the Annual Fee of $150,000 payable on the earlier of February 15, 2021 and the Closing Date, and (c) the Annual Fee of $150,000 payable on the earlier of February 15, 2022 and the Closing Date.  The Purchase Price shall be paid to GM in accordance with the wire instructions attached as Exhibit D.

(b)     GM shall assign to BB (or its designee) the Note and its interest, rights and claims in and with regard to the other Loan Documents and Claims free and clear of any lien or other encumbrance, and BB shall assume all obligations of GM under the Note and the Loan Documents.  Except as explicitly set forth herein, GM is not assigning to BB any right, title, and/or interest in the Loan or Loan Documents and Claims prior to the Closing Date.

(c)     Absent manifest error or fraud, the assignment of the Note and the other Loan Documents and Claims is made by GM without recourse of any type or kind to GM, and, except as expressly provided in this Agreement, without any representation or warranty of any kind by GM, whether express or implied in fact or by law.  Without limiting the generality of the foregoing sentence, GM makes no representations or

4817-6810-2076.6

warranties regarding (i) the collectability of the Loan, (ii) the creditworthiness of Borrower or any Guarantor, (iii) the form or sufficiency of the Loan Documents, (iv) the existence or value of any Collateral, or (v) the perfection or priority of any security interests or liens securing the Loan.

3.    On the Closing Date, and conditioned upon BB's payment to GM of the Purchase Price in full, GM shall deliver to BB (or its designee) (a) the original Note, (b) originals of the other Loan Documents, to the extent that GM has possession of the original Loan Documents (otherwise GM shall deliver copies of such Loan Documents), (c) an original executed Allonge to the Note in the form attached as Exhibit B, and (d) an executed assignment of GM's interest in the Loan Documents in the form attached as Exhibit C.

4.    Within three (3) business days after written request by BB, GM shall provide BB, in writing, a calculation of the Purchase Price as of the date on which such calculation is delivered to BB.

5.    Prior to the Closing Date, BB shall have no right, title, and/or interest in the Loan or Loan Documents and Claims, and GM shall retain all right, title, and/or interest therein until the Closing Date. Prior to the Closing Date, all payments on account of principal and interest on the Note and other amounts due pursuant to the Loan Documents shall be received by GM; provided, however, that, subject to Section 1(b)(i) and (ii) hereof, in the event that any party other than BB pays all or substantially all of the amounts due and owing on behalf of Borrower pursuant to the Loan Documents to GM, or otherwise purchases the Loan Documents and Claims from GM (such party being a "Purchaser") and GM accepts such payment (such payment being a "Third Party Recovery"), then to the extent that (a) the amount of the Third Party Recovery plus the Option Payment, exceeds (b) the sum of (i) the Current Balance, (ii) all accrued interest on the Loan from the Effective Date through the date of the Third Party Recovery (excluding any increased amount of interest charged as a consequence of any default) that has not been paid to GM by Borrower, and (iii) the Post Effective Date Costs through the date of the Third Party Recovery, GM shall be obligated to refund to BB such excess; provided, however, that GM acknowledges and agrees that BB may facilitate the identification of the Purchaser and may negotiate with the Purchaser to participate in the Purchaser's interest in the Loan Documents and Claims.

6.    Prior to the Closing Date, GM shall have sole authority to make decisions in connection with the Loan, including the authority to amend or waive any of the Loan Documents, provided, however, that GM agrees that it shall not (except as contemplated by this Agreement), without the prior written approval of BB (which such approval shall not be unreasonably withheld, conditioned and/or delayed), execute any amendment to or waiver of any of the Loan Documents which would: (i) forgive any principal, interest or other amounts owing to GM; (ii) increase the principal amount of the Loan; (iii) release or discharge Borrower or any other Guarantor or other person or entity obligated under the Loan Documents (except as otherwise expressly provided in the Loan Documents); or (iv) consent to any release or change in any Guarantor.  BB agrees to respond promptly, and in any event within five (5) business days (the "**Response Period**"), to any request made by GM ("**GM's Request**") for BB's approval to any of the foregoing actions. If

4817-6810-2076.6

GM does not receive BB's written response within the Response Period, such non-response shall constitute BB's agreement with GM's Request.

Prior to the Closing Date, GM shall have sole authority to make decisions in connection with any litigation matters against Borrower, any Guarantor or otherwise related to the Note or any Loan Document.

7.      Neither the execution of this Agreement, nor any other arrangement contemplated hereby is intended to be or to create, and the foregoing will not be construed to be or to create, any partnership, joint venture, or other joint enterprise between GM and BB; and neither the execution of this Agreement, nor the management and administration of the Loan Documents and the related documents by GM, nor any other right, duty or obligation of GM under or pursuant to this Agreement is intended to be or to create any express, implied, or constructive trust or other fiduciary relationship between GM and BB.

8.      BB represents to GM as of the date hereof and as of the Closing Date that:

(a)      BB is a limited liability company, duly organized and validly existing under the laws of the state of Delaware and has all requisite power and authority to execute and deliver, and to perform all of its obligations under, this Agreement;

(b)      the execution, delivery and performance of this Agreement has been duly authorized by all necessary action and does not and will not (i) require any further consent or approval of members or managers, (ii) violate any law, rule, regulation, order, writ, judgment, injunction, determination or award presently in effect having applicability to the BB or any provision of BB's certificate of formation or operating agreement, or (iii) result in a breach or constitute a default under any agreement to which BB is a party or by which it is bound, including any agreements between BB and Borrower;

(c)      this Agreement constitutes a legal, valid and binding obligation of BB enforceable against it in accordance with its terms; and

(d)      BB (i) has such knowledge and experience in financial matters that it is capable of evaluating the merits and risks of the Option, and the purchase of the Note and the other Loan Documents; (ii) is knowledgeable regarding the financial status of Borrower and Guarantors, the Note and the other Loan Documents and all of Borrower's and Guarantors' assets; (iii) has agreed to enter into this Agreement to acquire the Option to purchase the Note and GM's interest in the other Loan Documents on the basis of its own independent investigation, evaluation and credit determination and has not sought or relied upon any representation or warranty from GM or information provided by or statements made by GM or its representatives; (v) is acquiring the Option to purchase the Note for its own account and not with a view to, or for sale in connection with, any public distribution which would violate applicable securities laws; and (vi) the acquisition of the Option and the purchase and sale of the Note and GM's interest in the Security Agreement are exempt from registration under applicable Blue Sky or securities law.

6

9.      GM represents to BB as of the date hereof and as of the Closing Date that:

(a)     GM is a limited liability company, validly existing under the laws of the State of Michigan and has all requisite power and authority to execute and deliver, and to perform all of its obligations under, this Agreement;

(b)     the execution, delivery and performance of this Agreement has been duly authorized by all necessary action and does not and will not (i) require any consent or approval of shareholders, (ii) violate any law, rule, regulation, order, writ, judgment, injunction, determination or award presently in effect having applicability to the GM or any provision of GM's articles of organization or operating agreement, or (iii) result in a breach or constitute a default under any agreement to which GM is a party or by which it is bound;

(c)     this Agreement constitutes a legal, valid and binding obligation of GM enforceable against it in accordance with its terms;

(d)     true and complete copies of the Loan Documents and Claims are attached hereto as Exhibit E; and

(e)     GM has not sold, assigned, transferred or pledged the Note, the other Loan Documents or any of the Collateral and GM owns and holds the Note and the other Loan Documents free and clear of any lien or other encumbrance.

10.     Effective upon the Effective Date, BB agrees to defend and indemnify GM against and hold GM harmless, from any and all liability, claim, cost, loss, damage or expense (including reasonable attorney fees) which GM shall incur or suffer as a result of or arising out of or in connection with (a) any breach by BB of any representation or warranty of BB contained in this Agreement, (b) any failure by BB to carry out any of its obligations under this Agreement, and (c) any act or omission of BB occurring after the date of this Agreement. Neither GM nor any of its representatives will be liable for any action taken or omitted to be taken by it or them under this Agreement or any Loan Documents in good faith and reasonably believed by it or them to be within the discretion or power conferred upon it or them by this Agreement or any Loan Document, or be responsible for the consequences of any error of judgment, unless such actions taken or omitted to be taken (or errors of judgment) constitute gross negligence or willful misconduct. BB's exercise of the Option and purchase of the Loan Documents and Claims will be for the account and risk of BB and without recourse to GM on account of any failure of Borrower or Guarantors or sureties of Borrower to make payment of any sum due under the Loan Documents or otherwise to perform any covenant, condition or obligation of Borrower or Guarantors or sureties of Borrower to be performed under the Loan Documents. GM will not be bound to ascertain or inquire as to the performance of any of the terms, provisions, or conditions of the Loan Documents on the part of Borrower or any guarantors or sureties of Borrower except to the extent necessary to calculate the Purchase Price, or the Post Effective Date Costs. GM will exercise the same care in administering the Loan Documents as it exercises with respect to similar

7

4817-6810-2076.6

transactions entered into solely for its own account and will otherwise have no liability or responsibility to BB except as otherwise set forth herein and for actions taken or omitted to be taken by GM that constitute gross negligence or willful misconduct. GM will not be responsible in any manner to BB for and makes no representations or warranties regarding: (a) the effectiveness or enforceability, of the Loan Documents or any other documents against Borrower or any Guarantor, (b) the collectability, enforceability, or validity of the Loan, the Loan Documents, or the authorizations therefor by Borrower or any other party (other than GM), (c) any representation, warranty, document, certificate, report, or statement herein made or furnished under or in connection with any of such documents, (d) the adequacy of Collateral for the obligations of Borrower or any other party under the Loan Documents, (e) the existence, priority, or perfection of my liens or security interests granted or purported to be granted in connection with the Loan Documents, (f) the accuracy of any representation or warranty or statement made by Borrower or any other party (other than GM), (g) the observation of or compliance with any of the terms, covenants, or conditions of any such documents on the part of Borrower or any other party (other than GM); or (h) the solvency or financial condition of Borrower or any other party (other than GM).

11.     The parties covenant and agree to execute and deliver all such documents and to take all such further actions, including the provision of information, as the other may reasonably deem necessary, from time to time, to carry out the intent and purpose of this Agreement and to consummate the contemplated transactions.

12.     The agreements, representations and warranties of the parties shall survive the Closing Date.

13.     This Agreement shall be governed by and construed in accordance with the laws of the State of Michigan without reference to conflicts of laws principles. The state courts of Oakland County Michigan or the appropriate federal courts in the Eastern District of Michigan shall have exclusive jurisdiction for the enforcement and interpretation of this Agreement.

14.     This Agreement sets forth the entire agreement and understanding of the parties, and supersedes all prior agreements and understandings between the parties with respect to the subject matter of this Agreement.  This Agreement shall be binding on, and inure to the benefit of, the parties and their successors and assigns.

15.     Any notice required or permitted to be given under this Agreement may be given by first class mail, overnight courier, hand delivery, or email to the following addresses (or such address as may hereafter be furnished to the other parties hereto, in writing, by such party wishing to change its address or facsimile number).

If to BB:                  BB Invescor I, LLC
c/o Bravia Capital
445 Park Avenue, 20th Floor
New York, New York 10022
Attn: Rinarisa Coronel DeFronze, Chief Legal Counsel
Email: rcd@braviacapital.com

If to GM:              Grow Michigan, LLC
Two Lone Pine Road
Bloomfield Hills, MI 48304
Attn: Patrick O'Keefe
Email: pokeefe@okeefellc.com

with a copy (which shall not constitute notice) to:

Howard & Howard Attorneys PLLC
450 W 4th St.
Royal Oak, MI 48363
Attn: Henry J. Brennan
Email: hbrennan@howardandhoward.com

16.     GM and BB each represent and warrant to the other that no person or entity is entitled to any commission, finder's fee, acquisition fee or other brokerage type compensation based upon the acts of that party with respect to the transaction contemplated by this Agreement.

17.     Time is of the essence.

18.     This Agreement may be signed in counterparts, each of which shall be an original and both of which taken together shall constitute one agreement. Electronic and/or facsimile signatures shall be effective for all purposes.

19.     GM may not assign this Agreement without BB's prior written consent, which consent shall not be unreasonably withheld. BB shall not assign this Agreement without the prior written consent of GM, which consent shall not be unreasonably withheld.

20.     This Agreement may not be changed, waived, discharged or terminated orally, but only by an instrument in writing signed by the party against which enforcement of such change, waiver, discharge or termination is sought.

**GROW MICHIGAN, LLC**

By: _____
Name: _____PATRICK M. O'Keefe_____
Its: _____CGO_____

9

4817-6810-2076.6

**BB INVESCOR I, LLC**

By: _____
Name: Bharat Bhise
Its: Director

4813-7623-6987 v.21

4817-6810-2076.6

**EXHIBIT A**

**LOAN DOCUMENTS**

1. Business Loan Agreement, dated August 30, 2019

2. Promissory Note, dated August 30, 2019, in the principal amount of $5,000,000

3. Security Agreement, dated August 30, 2019

4. Intellectual Property Security Agreement, dated August 30, 2019

5. Guaranty, dated August 30, 2020, by Lightning Pooling, Inc. in favor of Grow Michigan, LLC

6. Guaranty, dated August 30, 2020, by Jeffrey Owen in favor of Grow Michigan, LLC

7. Subordination Agreement, dated _____, by Paul Shamo in favor of Grow Michigan, LLC

8. Subordination Agreement, dated _____. By Robert Causley in favor of Grow Michigan, LLC

11

4817-6810-2076.6

**EXHIBIT B**

**ALLONGE AND ENDORSEMENT**

THIS ALLONGE is made to, shall be attached to and shall constitute a part of that certain Promissory Note dated August 30, 2019 in the original principal amount of $5,000,000 (the "Note") made by Lightning Technologies, Inc. in favor of Grow Michigan, LLC ("GM"), for purposes of the endorsement of the Note to BB Invescor I, LLC ("BB"), as set forth below.

**PAY TO THE ORDER OF BB INVESCOR I, LLC WITHOUT REPRESENTATION, WARRANTY OR RECOURSE OF ANY KIND EXCEPT AS EXPRESSLY SET FORTH IN THE LOAN PURCHASE AGREEMENT DATED MAY __, 2020, BETWEEN ASSIGNOR AND ASSIGNEE.**

This Allonge and the endorsement herein is made as an outright endorsement and assignment and not as a security device of any kind.

Executed this _____ day of _____, 2020

GROW MICHIGAN, LLC

By:_____

Its:_____

12

**EXHIBIT C**

**ASSIGNMENT AND ASSUMPTION OF GROWTH MICHIGAN, LLC'S INTEREST IN LOAN DOCUMENTS AND CLAIMS**

This Assignment and Assumption of GM's Interest in Loan Documents and Claims ("Assignment") is executed and delivered as of _____, 2020 by Grow Michigan, LLC ("GM") and BB Invescor I, LLC ("BB"), a Delaware limited liability company.

**RECITALS:**

GM and BB entered into a Loan Purchase Option Agreement dated May ___, 2020 (the "Agreement"). Capitalized terms not defined in this Assignment shall have the meanings ascribed to them in the Agreement.

The Closing Date has occurred, and GM is required to assign and deliver certain instruments and documents contemplated by the Agreement, and BB is required to assume certain obligations of GM, all as hereinafter set forth.

**NOW THEREFORE**, for good and valuable consideration, the receipt and adequacy of which is acknowledged, GM and BB state as follows:

1.      GM does hereby sell, transfer, assign, grant and convey to BB GM's interest, rights and claims in and with regard to the Loan and the Loan Documents and Claims, but excluding GM's interest in costs and expenses (including attorney fees) incurred by GM prior to the Closing Date; provided, however, in no event shall GM take any action against or otherwise pursue Borrower, any Guarantor or any other person or entity for such costs and expenses.  Such sale, transfer, assignment, grant and conveyance is made without recourse, representations or warranties of any kind except as may be otherwise expressly set forth in the Agreement.  BB hereby assumes and agrees to perform all of GM's obligations under the Note and the Loan Documents.

2.      This Assignment and Assumption shall be governed by and construed in accordance with the laws of the State of Michigan.

**GROW MICHIGAN, LLC**

By:_____

Its:_____

4817-6810-2076.6

**BB INVESCOR I, LLC**

By:

Name:_____

Its:_____

4817-6810-2076.6

**EXHIBIT D**

**GROWTH MICHIGAN, LLC'S WIRE INSTRUCTIONS**


**Bank Name:** Old National Bank
**City/State:** Jackson, MI 49201
**ABA Routing Transit Number:** # 086300012
**Credit to:** Grow Michigan, LLC Account # 104324887

# EXHIBIT E

# COPIES OF ALL LOAN DOCUMENTS AND CLAIMS

**Exhibit 5**

DocuSign Envelope ID: FB935B25-D425-468E-91A6-E626F5071D30



November 19, 2020

BB Invescor I, LLC
c/o Bravia Capital
445 Park Avenue, 20th Floor
New York, New York 10022
Attn: Mr. Bharat Bhise

**Re:** **Loan Purchase Option Agreement ("Option Agreement") dated May 28, 2020 between Grow Michigan, LLC ("GM") and BB Invescor I, LLC ("BB")**

Dear Mr. Bhise:

In connection with the above-referenced Option Agreement, this will confirm our mutual agreement on the following:

1. On or about September 23, 2020, GM provided written notice to BB of the existence of a Material Adverse Effect pursuant to Section 1(b)(i)(B) of the Option Agreement, and consequently provided BB 30 days to exercise the Option as provided therein.

2. On October 23, 2020, BB provided GM an Option Notice exercising the Option, which pursuant to Section 1(b)(i)(B) required that the Closing Date occur within ten (10) business days thereafter, which was Friday, November 6, 2020.

3. BB has requested that GM extend such Closing Date until 5:00 p.m. EST on May 13, 2021 and, in consideration therefor and the other agreements set forth herein, BB has agreed to pay GM an extension fee of $25,000 to be added to the Purchase Price.

4. As a result of the foregoing and the Option Payments made to date, the Purchase Price under the Option Agreement as of November 19, 2020 would then total $3,512,468.03 as set forth on Schedule I attached hereto (the "Revised Balance"), plus the amount of any unpaid legal fees incurred by GM.

5. As additional consideration for such extension, BB has agreed to pay to GM all of the following payments and amounts as additional Post Effective Date Costs/Option Payments under the Option Agreement:

   a. Twenty-five (25) consecutive weekly payments in the amount of $100,000 each which shall be due and payable commencing Thursday, November 19,

1FIR0010 Park Road, Bloomfield Hills, Michigan 48304
Telephone: 517.513.8923 ♦ www.growmicapital.com

DocuSign Envelope ID: FB935B25-D425-468E-91A6-E626F5071D30

2020 and continuing thereafter on each of the next twenty-four (24) consecutive Thursdays thereafter, through and including May 6, 2021, which payments shall be first applied to payment of any costs and expenses (including attorneys' fees) related to the Loan which are payable under the Option Agreement as Post Effective Date Costs, then to interest on the Revised Balance at the Revised Interest Rate (as hereinafter defined), and the balance applied to principal; and

      b.     One (1) installment in an amount equal to remaining outstanding principal balance on May 13, 2021, together with any accrued but unpaid interest thereof.

6.     BB and GM hereby agree that time is of the essence and that any failure by BB to timely make any of the payments required hereunder shall be considered a default by BB hereunder. In addition, any failure by the Borrower or BB to timely pay any monthly installment of rent due or any other default under the Borrower's real estate leases shall also be considered a default by BB hereunder. In the event of any such written notice of default, BB shall be granted three (3) business days to effectuate a cure of any default. If any default goes uncured, the Option shall automatically terminate and be of no further force and effect and, and GM shall be entitled to retain all Option Payments, but will credit the Borrower's Principal balance outstanding equal to any applied principal paid to date under the Option Agreement.

7.     For purposes hereof, the "Revised Interest Rate" shall mean eighteen (18%) percent per annum, provided, however, in the event that (and only in the event that) BB timely pays all of the payments set forth in Paragraph 5 above when and as expressly set forth in Paragraph 5 (including, without limitation, the balloon payment set forth in Paragraph 5(b)), then and only in such event the "Revised Interest Rate" shall then mean twelve (12%) percent per annum and the application of the interest and principal payments made pursuant to Paragraphs 5(a) and (b) hereof shall be recalculated accordingly.

8.     BB (for itself and on behalf of its principals and affiliates) hereby agrees to waive any objections to GM's conducting of a Uniform Commercial Code ("UCC") Article 9 sale of the assets of the Borrower after the earlier of (i) May 13, 2021 (in the event that the Closing contemplated by the Option does not occur for any reason by May 13, 2021), (ii) a default by BB hereunder or under the Option Agreement, or (iii) the filing of a voluntary or involuntary bankruptcy proceeding by or against the Borrower.

9.     The Borrower (for itself and on behalf of its principals and affiliates) by signing this letter where indicated below hereby waives any objections to GM's conducting of a UCC Article 9 sale of the assets of the Borrower after the earlier of (i) May 13, 2021 (in the event that the Closing contemplated by the Option does not occur for any reason by May 13, 2021), (ii) a default by BB hereunder or under the Option Agreement, or (iii) the filing of a voluntary or involuntary bankruptcy proceeding by or against the Borrower.

Telephone: 517.513.8923 ♦ www.growmicapital.com

DocuSign Envelope ID: FB935B25-D425-468E-91A6-E626F5071D30

November 19, 2020
Page 3

     10.     Provided that BB complies with all of its obligations set forth herein and in the Option Agreement and no uncured monetary default exists hereunder, GM hereby agrees to:

     a.     Extend the Closing Date until 5:00 p.m. EST on May 13, 2021;

     b.     Forbear from holding a UCC Article 9 sale of the assets of the Borrower or from exercising any other material enforcement rights or remedies against the Borrower until the earlier of (i) May 13, 2021 (in the event that the Closing contemplated by the Option does not occur for any reason by May 13, 2021), (ii) an uncured default by BB hereunder, or (iii) the filing of a voluntary or involuntary bankruptcy proceeding by or against the Borrower; and

     c.     Consent to BB's Emergency Funding Debt it has lent, and may continue to lend to Borrower in accordance with Borrower's Emergency Funding Board Resolution; provided, that the same is fully subordinated in terms of security and payment to GM's Loan and collateral, and provided that BB executes and delivers to GM a Subordination Agreement attached hereto concurrently with the execution hereof.

     d.     Forbear from exercising any material enforcement rights or remedies against BB under the Option Agreement (except only for non-payment of amounts due hereunder) until the earlier of (i) May 13, 2021 (in the event that the Closing contemplated by the Option does not occur for any reason by May 13, 2021), (ii) an uncured default by BB hereunder, or (iii) the filing of a voluntary or involuntary bankruptcy proceeding by or against the Borrower

     11.     Except as amended hereby, the remaining terms and conditions of the Option Agreement shall remain in full force and effect as provided therein. Capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Option Agreement.

     If the foregoing constitutes our mutual agreement on the foregoing, please sign and date this letter agreement where indicated below and return it to the undersigned immediately.

     Very truly yours,

     GROW MICHIGAN, LLC

     By: _____
     Patrick M. O'Keefe, CEO

18.. 1 uu .1 ..2/ 3 Bloomfield ..Mills, Michigan ...
Telephone: 517.513.8923 ♦ www.growmicapital.com

DocuSign Envelope ID: FB935B25-D425-468E-91A6-E626F5071D30

November 19, 2020
Page 4

The undersigned hereby agrees to the
foregoing this 19th day of November, 2020:

BB INVESCOR I, LLC

By: _____
    _29100ABD93FA4FC..._

       Bharat Bhise, Director

For good and valuable consideration,
the receipt and sufficiency of which is hereby acknowledged,
the undersigned hereby agrees to Paragraph 9
hereof this 19th day of November, 2020:

LIGHTNING TECHNOLOGIES, INC.

By: _____
    _C74847D55E854F8..._

       Jeffrey Owen, President

4842-6956-9745

18 First The Road ◆ Bloomfield Hills, Michigan 48304
Telephone: 517.513.8923 ◆ www.growmicapital.com

DocuSign Envelope ID: FB935B25-D425-468E-91A6-E626F5071D30

November 19, 2020
Page 5

## <u>SCHEDULE I</u>

**See Attached**

1889 Telegraph Road, Bloomfield Hills, Michigan 48304
Telephone: 517.513.8923 ♦ www.growmicapital.com

**11/12/20**
**Accrual Basis**

# Grow Michigan LLC
## Transaction Detail by Account
### All Transactions

**Lightning Technologies**

| Type | Date | Num | Principal | Interest | Commitment/ Annual Fee | Total |
|------|------|-----|-----------|----------|------------------------|-------|
| | | | 3,400,063.85 | | 100,000.00 | |
| Invoice | 10/07/2019 | 1966 | | 43,917.49 | | |
| Invoice | 11/06/2019 | 1972 | | 43,917.49 | | |
| Invoice | 12/04/2019 | 1983 | | 42,500.80 | | |
| Invoice | 12/31/2019 | 1991 | | 43,917.49 | | |
| Invoice | 02/03/2020 | 2003 | | 41,084.10 | 150,000.00 | |
| Invoice | 03/10/2020 | 2010 | | 46,561.99 | | |
| Invoice | 04/16/2020 | 2018 | | 49,773.16 | | |
| Invoice | 05/11/2020 | 2025 | | 48,167.57 | | |
| Invoice | 06/10/2020 | 2038 | | 49,773.16 | | |
| Invoice | 07/09/2020 | 2045 | | 42,500.80 | | |
| Invoice | 08/06/2020 | 2052 | | 43,917.49 | | |
| Invoice | 09/04/2020 | 2061 | | 43,917.49 | | |
| Invoice | 10/05/2020 | 2068 | | 39,667.41 | | |
| Invoice | 11/05/2020 | | | 40,989.66 | | |
| November Interest through 11/20/20 | | | | 26,444.94 | 325,000.00 | |
| **Total Due to Date** | | | 3,400,063.85 | 647,051.04 | 575,000.00 | 4,622,114.89 |
| | | | | | | |
| **Total Payments Made by Lightning** | | | 0.00 | 174,253.27 | 100,000.00 | 274,253.27 |
| | | | | | | |
| **Net Due from Lightning** | | | 3,400,063.85 | 472,797.77 | 475,000.00 | 4,347,861.62 |
| | | | | | | |
| | | | | | | |
| **Total Payments Made by BB** | | | 212,503.99 | 471,567.35 | 150,000.00 | 834,071.34 |
| | | | | | | |
| **Net Due from BB** | | | 3,187,559.86 | 1,230.42 | 325,000.00 | 3,513,790.28 |
| | | | | | | |
| Per Diem Interest | | | 1,322.25 | | | |

DocuSign Envelope ID: FB935B25-D425-468E-91A6-E626F5071D30

**SUBORDINATION AGREEMENT**
(All Indebtedness and Liens)
(BB INVESCOR I, LLC)

Lightning Technologies Inc. ("Borrower") is currently indebted to the undersigned ("Creditor") in the current sum of $_____ evidenced by an Emergency Funding Resolution with a current funding Exhibit attached (which may be modified from time to time) evidencing the amounts lent which are consented to by Lender subject to the Creditor's execution of this Agreement in an amount not to exceed $3,000,000 which indebtedness is unsecured, and Creditor is or may become financially interested in Borrower and desires to aid Borrower in obtaining or having continued financial accommodations, whether by way of loan, commitment to loan, discounting of instruments, extensions of credit or the obtaining of any other financial aid from Grow Michigan, LLC ("Lender").

In order to induce the Lender to extend or to continue to extend financial accommodations to Borrower from time to time (whether by way of a loan, commitment to loan, discounting of instruments, extension of credit or otherwise) and in consideration of Lender allowing Creditor to loan and secure the Subordinated Indebtedness (as hereinafter defined) to and against Borrower, and in consideration of any of these financial accommodations, Creditor agrees as follows:

1.  Any and all obligations and liabilities of Borrower to Creditor, including, without limit, principal and interest payments, whether direct or indirect, absolute or contingent, joint or several, secured or unsecured, due or to become due, now existing or later arising and whatever the amount and however evidenced (the "Subordinated Indebtedness"), are subordinated in right of payment to any and all obligations and liabilities of Borrower to the Lender, including, without limit, principal and interest payments, whether direct or indirect, absolute or contingent, joint or several, secured or unsecured, due or to become due, now existing or later arising and however evidenced, together with all other sums due thereon and all costs of collecting the same (including, without limit, reasonable attorney fees) for which Borrower is liable (the "Senior Indebtedness").

2.  Creditor will not ask for, demand, sue for, take or receive (by way of voluntary payment, acceleration, set-off or counterclaim, foreclosure or other realization on security, dividends in bankruptcy or otherwise), or offer to make any discharge or release of, any of the Subordinated Indebtedness, and Creditor waives any such rights with respect to the Subordinated Indebtedness nor shall Creditor exercise any rights of subrogation or other similar rights with respect to the Senior Indebtedness.

3.  Creditor will not exercise any of Creditor's rights in any collateral now or later securing the Subordinated Indebtedness. All rights of Creditor in any collateral now or later securing the Subordinated Indebtedness are subordinated to all rights of the Lender now or later existing in any of the same collateral securing the Senior Indebtedness.

4.  Creditor authorizes and empowers the Lender to demand, enforce payment by legal proceedings, receive and give acquittances for the Subordinated Indebtedness and to exercise all rights of Creditor in any security (other than a deed of trust, mortgage or security interest covering real property or a principal dwelling) now or later held for the Subordinated Indebtedness. As collateral for the Senior Indebtedness, Creditor hereby pledges, assigns and grants to Lender a security interest in the Subordinated Indebtedness, any collateral or other security (other than a deed of trust, mortgage or security interest covering real property or a principal dwelling) for the Subordinated Indebtedness, and all claims or demands of Creditor in connection therewith, with full right on the part of the Lender, in its own name or in the name of Creditor, to collect and enforce these claims or demands, by suit, proof of debt in bankruptcy, or in any other proceeding involving dissolution, insolvency, liquidation or an adjustment of the indebtedness of Borrower. Except as required by any non-waivable legal requirements, the Lender has no obligation to the Creditor to take any steps with regard to these claims or demands, the Subordinated Indebtedness, or any collateral or other security for the Subordinated Indebtedness.

5.  Should any payment, distribution or security or proceeds from these be received by Creditor upon or with respect to the Subordinated Indebtedness prior to the satisfaction in full of the Senior Indebtedness, Creditor shall immediately deliver same to the Lender in the form received (except for endorsement or assignment by Creditor where required by the Lender), for application on the Senior Indebtedness (whether or not then due and in such order of maturity as Lender elects) and, until so delivered, the same shall be held in trust by Creditor as the property of the Lender.

6.  Creditor represents and warrants that it has not made or permitted to be made and shall not make or permit any

assignment, transfer, pledge, or disposition for collateral purposes or otherwise, of all or any part of the Subordinated Indebtedness or any collateral or other security for the Subordinated Indebtedness so long as this Agreement remains in effect. Creditor shall, on the date of this Agreement or promptly upon receipt if not yet delivered to Creditor, deliver to the Lender, endorsed if required by the Lender, all notes and other instruments evidencing any Subordinated Indebtedness. Creditor agrees to execute all financing statements deemed necessary by the Lender to perfect the Lender's rights and interests under this Agreement. The Lender is to have all the rights and remedies of a secured creditor under the Michigan or other applicable Uniform Commercial Code, as amended from time to time, with respect to such interests. Subject to the terms and conditions hereof, the Creditor is to have all the rights and remedies of a secured creditor under the Michigan or other applicable Uniform Commercial Code, as amended from time to time, subordinate in priority to Lender. Creditor further makes, constitutes and appoints Lender its limited attorney-in-fact with full power of substitution to take  actions in furtherance of this Agreement only (not under any other agreements with Creditor), including, but not limited to, the signing of financing statements, endorsing of instruments, and the execution and delivery of all documents and agreements necessary to obtain or accomplish any protection for or collection or disposition of any part of any collateral. Such appointment shall be deemed irrevocable and coupled with an interest.

7.    This Agreement constitutes a continuing agreement of subordination, even though at times Borrower is not indebted to the Lender. The Lender may continue, in reliance on this Agreement, without notice to Creditor, to lend monies, extend credit, modify, renew or make other financial accommodations, to or for the account of Borrower until the fifth (5th) day ("effective date") following written acknowledgment by an officer of the Lender that the Lender received written notice of revocation of this Agreement from Creditor. Any such notice of revocation shall not be effective as to any Senior Indebtedness existing at the effective date of revocation or any Senior Indebtedness created after that pursuant to any commitment or agreement of the Lender or pursuant to any Borrower loan (whether advances or readvances by the Lender after the effective date of revocation are optional or obligatory) existing at the effective date of revocation or any modifications or renewals of any such Senior Indebtedness, whether in whole or in part. Possession by the Lender of any note or other evidence of indebtedness made, endorsed or guaranteed by Borrower shall be conclusive evidence (but not the only means of establishing) that Borrower is indebted to the Lender.

8.    Creditor delivers this Agreement based solely on Creditor's independent investigation of (or decision not to investigate) the financial condition of Borrower and is not relying on any information furnished by the Lender. Creditor assumes full responsibility for obtaining any further information concerning Borrower's financial condition, the status of the Senior Indebtedness or any other matter which Creditor may deem necessary or appropriate now or later.  Creditor waives any duty on the part of the Lender, and agrees that Creditor is not relying upon nor expecting the Lender to disclose to Creditor any fact now or later known by the Lender, whether relating to the operations or condition of Borrower, the existence, liabilities or financial condition of any guarantor of the Senior Indebtedness, the occurrence of any default with respect to the Senior Indebtedness, or otherwise, notwithstanding any effect such fact may have upon Creditor's risk or Creditor's rights against Borrower.  Creditor knowingly accepts the full range of risk encompassed in this Agreement, which risk includes, without limit, the possibility that Borrower may incur Senior Indebtedness to the Lender after the financial condition of Borrower, or its ability to pay Borrower's debts as they mature, has deteriorated.  Creditor acknowledges and agrees that the Lender's rights under this Agreement are not conditioned upon pursuit by the Lender of any remedy the Lender may have against Borrower or any other person or any other security. The absence of Borrower's signature at the end of this Agreement shall in no way impair or affect the validity of this Agreement.

9.    The Lender, in its sole discretion, without notice to Creditor, may release, exchange, enforce and otherwise deal with any security now or later held by the Lender for payment of the Senior Indebtedness or release any party now or later liable for payment of the Senior Indebtedness without affecting in any manner the Lender's rights under this Agreement. Creditor acknowledges and agrees that the Lender has no obligation to acquire or perfect any lien on or security interest in any asset(s), whether realty or personalty, to secure payment of the Senior Indebtedness, and Creditor is not relying upon assets in which the Lender has or may have a lien or security interest for payment of the Senior Indebtedness.

10.   Notwithstanding any prior revocation, termination, surrender, or discharge of this Agreement in whole or in part, the effectiveness of this Agreement shall automatically continue or be reinstated in the event that any payment received or credit given by the Lender in respect of the Senior Indebtedness is returned, disgorged, or rescinded under any applicable state or federal law, including, without limitation, laws pertaining to bankruptcy or insolvency, in which case this Agreement, shall be enforceable against the Creditor as if the returned, disgorged, or rescinded payment or credit had not been received or given by the Lender, and whether or not the Lender relied upon this

payment or credit or changed its position as a consequence of it. In the event of continuation or reinstatement of this Agreement, the Creditor agrees upon demand by the Lender to execute and deliver to the Lender those documents which the Lender determines are appropriate to further evidence (in the public records or otherwise) this continuation or reinstatement, although the failure of the Creditor to do so shall not affect in any way the reinstatement or continuation.

11.     Creditor waives any right to require the Lender to: (a) proceed against any person or property; (b) give notice of the terms, time and place of any public or private sale of personal property security held from Borrower or any other person, or otherwise comply with the provisions of Section 9-611 or 9-621 of the Michigan or other applicable Uniform Commercial Code, as the same may be amended, revised or replaced from time to time; or (c) pursue any other remedy in the Lender's power. Creditor waives notice of acceptance of this Agreement and presentment, demand, protest, notice of protest, dishonor, notice of dishonor, notice of default, notice of intent to accelerate or demand payment of any Senior Indebtedness, any and all other notices to which the undersigned might otherwise be entitled, and diligence in collecting any Senior Indebtedness, and agrees that the Lender may, once or any number of times, modify the terms of any Senior Indebtedness, compromise, extend, increase, accelerate, renew or forbear to enforce payment of any or all Senior Indebtedness, or permit the Borrower to incur additional Senior Indebtedness, all without notice to Creditor and without affecting in any manner the unconditional obligations of Creditor under this Agreement.

12.     Creditor acknowledges that the Lender has the right to sell, assign, transfer, negotiate or grant participations or any interest in, any or all of the Senior Indebtedness and any related obligations, including without limit this Agreement. In connection with the above, but without limiting its ability to make other disclosures to the full extent allowable, the Lender may disclose all documents and information which the Lender now or later has or acquires relating to Creditor and this Agreement, however obtained. Creditor further agrees that the Lender may disclose such documents and information to Borrower. Creditor further agrees that the Lender may provide information relating to this Agreement or relating to Creditor to the Lender's parent, affiliates, subsidiaries and service providers.

13.     No waiver or modification of any of its rights under this Agreement shall be effective unless the waiver or modification shall be in writing and signed by an authorized officer on behalf of the Lender. Each waiver or modification shall be a waiver or modification only with respect to the specific matter to which the waiver or modification relates and shall in no way impair the rights of the Lender or the obligations of Creditor to the Lender in any other respect.

14.     This Agreement shall bind and be for the benefit of Creditor and the Lender and their respective successors and assigns, and shall be construed according to the laws of the State of Michigan, without regard to conflict of laws principles. If this Agreement is executed by two or more persons, it shall bind each of them individually as well as jointly.

15.     The term "Borrower", as used in this Agreement, includes any person, corporation, partnership or other entity which succeeds to the interests or business of Borrower named above, and the terms "Senior Indebtedness" and "Subordinated Indebtedness" include indebtedness of any successor Borrower to the Lender and Creditor.

16.     Creditor agrees to pay to or reimburse the Lender, upon demand any and all costs and expenses of Lender (including, without limit, court costs, legal fees, and reasonable attorney fees whether inside or outside counsel is used, whether or not suit is instituted and, if instituted, whether at the trial or appellate level, in a bankruptcy, probate or administrative proceeding, or otherwise) incurred in connection with the preparation, execution, delivery, amendment, administration and performance of this Agreement and the related documents, or incurred in enforcing any of the duties and obligations of Creditor under this Agreement.

17.     Creditor waives any defense against the enforceability of this Agreement based upon or arising by reason of the application by Borrower of the proceeds of any Indebtedness for purposes other than the purposes represented by Borrower to the Lender or intended or understood by the Lender or Creditor. Creditor waives all rights to require the Lender to marshall the Collateral or any other property the Lender may at any time have as security for the Indebtedness and waives all right to require the Lender to first proceed against any guarantor or other person before proceeding against the Collateral.

18.     The relative priorities of the Lender and Creditor in the Collateral as set forth in this Agreement control irrespective of the time, method or order of attachment or perfection of the liens and security interests acquired by

DocuSign Envelope ID: FB935B25-D425-468E-91A6-E626F5071D30

the parties in the Collateral and irrespective of the priorities as would otherwise be determined by reference to the Uniform Commercial Code or other applicable laws. Creditor shall not contest the validity, priority or perfection of the Lender's security interest in the Collateral (regardless of whether the Lender's security interest in the Collateral is valid or perfected). The priorities of any liens or security interests of the parties in any property of the Borrower other than the Collateral are not affected by this Agreement and shall be determined by reference to applicable law. The Lender's rights under this Agreement are in addition to, and not in substitution of, its rights under any other subordination agreement with Creditor.

[*Signature Pages Follow*]

DocuSign Envelope ID: FB935B25-D425-468E-91A6-E626F5071D30

THE UNDERSIGNED AND THE LENDER ACKNOWLEDGE THAT THE RIGHT TO TRIAL BY JURY IS A CONSTITUTIONAL ONE, BUT THAT IT MAY BE WAIVED. EACH PARTY, AFTER CONSULTING (OR HAVING HAD THE OPPORTUNITY TO CONSULT) WITH COUNSEL OF THEIR CHOICE, KNOWINGLY AND VOLUNTARILY, AND FOR THEIR MUTUAL BENEFIT, WAIVES ANY RIGHT TO TRIAL BY JURY IN THE EVENT OF LITIGATION REGARDING THE PERFORMANCE OR ENFORCEMENT OF, OR IN ANY WAY RELATED TO, THIS AGREEMENT.

**IN WITNESS WHEREOF**, Creditor has caused this Agreement to be executed as of ~~October~~ November 19, 2020.

**BB INVESCOR I, LLC**

BY: _Bharat Bhise_
29100ABD93FA4FC...

Name: Bharat Bhise

ITS: Director

CREDITOR'S ADDRESS

445 Park Avenue, 20th Floor
STREET ADDRESS

New York          NY          10022
CITY              STATE       ZIP

### LENDER'S ACKNOWLEDGMENT

Grow Michigan, LLC ("Lender") consents to the subordination created by this Agreement.

**GROW MICHIGAN, LLC**

BY: _[signature]_

Name: PATRICK M. O'KEEFE

ITS: CEO

LENDER'S ADDRESS

2 Towne Pine Rd
STREET ADDRESS

Bloomfield Hills  Michigan  48304
CITY              STATE      ZIP

Dated: ~~October~~ November 19, 2020

**BORROWER'S ACKNOWLEDGMENT**

Lightning Technologies Inc. ("Borrower") accepts notice of subordination created by this Agreement and agrees that it will take no action inconsistent with this Agreement and that, except with the prior written approval of Lender, no payment or distribution shall be made by Borrower on or with respect to the Subordinated Indebtedness, so long as this Agreement remains in effect. Borrower agrees that the Lender may, at its option, without notice and without limiting Lender's other rights, upon any breach by Creditor of, or purported termination by the Creditor of, this Agreement, declare all Senior Indebtedness to be immediately due and payable and/or terminate any commitments of Lender to Borrower.

**LIGHTNING TECHNOLOGIES INC.**

BY: _Jeffrey Owen_
     C74847D55E854F8

Name: _Jeffrey Owen_
ITS: _President_

**BORROWER'S ADDRESS**

_2171 Xcelsior Drive_
STREET ADDRESS

_Oxford_        _Michigan_        _48371_
CITY                STATE                ZIP

Dated: ~~October~~ _19_ , 2020
        November